# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CARMEN MELENDEZ,**

<strong>Plaintiff,</strong>

**-vs-**                                              **Case No.  6:05-cv-1296-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,**

<strong>Defendant.</strong>

_____

# ORDER

This cause came on for consideration without oral argument on the Complaint filed by

Carmen Melendez[1] seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

(SSA).  Doc. Nos. 9, 10.  Pursuant to the consent of the parties, this matter has been referred to me

for disposition under 28 U.S.C. § 636(c).  Doc. No. 13.

## I.      PROCEDURAL HISTORY.

In 2003, Melendez applied for disability benefits under the Federal Old Age, Survivors and

Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.* (sometimes referred to herein as

the Act).  R. 51-52.  The application alleged that Melendez became disabled on June 20, 2002.  R.

51.  Melendez's application was denied initially and on reconsideration.  R. 43, 48.

_____

[1] Melendez is occasionally referred to in the record as Carmen Melendez-Toledo.

Melendez requested a hearing before an administrative law judge (ALJ).  R. 40.  An ALJ held a hearing on December 15, 2004.  Melendez, represented by an attorney, testified at the hearing with the assistance of an interpreter.  R. 288-315.  A vocational expert (VE) also testified at the hearing.  315-18.

After considering the testimony and the medical evidence presented, the ALJ determined that Melendez was insured through the date of the decision, which was rendered on April 26, 2005.  R. 19.  The ALJ found that Melendez had not engaged in substantial gainful activity since June 20, 2002, the alleged onset date of her disability.  R. 19, 24.

The ALJ concluded that the medical evidence showed that Melendez had fibromyalgia, degenerative joint disease, bursitis [2], and depression, which were severe impairments.  R. 21.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[3]  R. 21.  The ALJ concluded that Melendez's mental impairment would result in mild restriction of activities of daily living, mild difficulties with social functioning, and moderate difficulties maintaining concentration, persistence or pace, with no episodes of decompensation of extended duration.  R. 20

---

[2] Bursitis is the inflammation of the fluid-filled sac that lies between a tendon and the skin, or between a tendon and a bone.  Medline Plus, *Bursitis*, http://www.nlm.nih.gov/medlineplus/ency/ article/000419.htm (last visited Mar. 13, 2007).

[3] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

After considering all of the evidence in the record, the ALJ found that Melendez had the residual functional capacity (RFC)[4] to perform a significant range of light work[4] with occasional postural limitations.  The ALJ also concluded that Melendez "should avoid concentrated exposure to extreme heat and hazards, and is limited to occasional use of both hands due to carpal tunnel syndrome."  R. 23.  Additionally, Melendez could only perform work requiring simple routine repetitive tasks due to her mental impairments.  R. 20.

In reaching this decision, the ALJ did not give controlling weight to the opinion of Dr. Nau, one of Melendez's treating physicians.  R. 21.  The ALJ found that Dr. Nau's RFC assessment was inconsistent with his treatment records and with the other medical records before the ALJ.  *Id.*  The ALJ also found that while Melendez had limitations arising from pain and other subjective symptoms, Melendez's testimony about the extent of those limitations was not fully credible because her testimony was inconsistent with the medical records and because of Melendez's inconsistent reports of why she left her last job.  R. 22.

Based on the VE's testimony, the ALJ concluded that Melendez could not perform her past relevant work as a machine operator.  R. 23.  Relying on the testimony of the VE and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, as a framework, the ALJ concluded that Melendez could work at the unskilled sedentary jobs of surveillance systems monitor, food and beverage order clerk, and ticket checker, all of which

---

[4] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

existed in significant numbers in the national economy.  R. 24.  Accordingly, the ALJ concluded

that Melendez was not disabled.  *Id.*

    Melendez requested review of the ALJ's decision.  R. 10.  On June 24, 2005, the Appeals

Council issued a decision finding no basis to review the ALJ's decision.  R. 6-8.  Melendez timely

sought review of the decision by this Court.  Doc. No. 1.

## II.    JURISDICTION.

    The ALJ's decision became the final decision of the Commissioner when the Appeals

Council denied Melendez's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir.

1998); 20 C.F.R. § 404.981.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## III.    STATEMENT OF FACTS.

    A.    *Melendez's Testimony.*

    Melendez was born on November 13, 1958.  R. 291.  She completed high school.  R. 292.

She is 5' tall and weighed approximately 133 pounds at the time of the hearing.  R. 296.

    Melendez previously worked as a machine operator at a factory in Puerto Rico.  R. 292.

While working in the factory, she performed a variety of tasks, one of which was trainer, and

occasionally supervised her department.  R. 298.  She lifted heavy objects as part of her job.  *Id*.

She had difficulty performing her job due to problems with her hands.  R. 297.  She quit working

in June of 2002 due to depression.  *Id*.  After she took an overdose of medication in an attempt to

kill herself, a psychiatrist told her not to work for six months.  *Id*.

Moving heavy weight while working resulted in Melendez tearing a ligament in her knee. R. 298.  She also suffered a herniated disc while working.  *Id*.  In addition, she had had carpal tunnel surgery on her hands.  *Id*.

Melendez testified that she had no strength in her hands, and that she could not perform repetitive tasks. R. 294.  She also had difficulty writing due to pain. R. 296.

Melendez had arthritis in her right leg and her back. R. 294.  Her right leg often swelled and gave way when she walked. R. 304.  She could not sit or stand for long periods, and she had fallen in the past. R. 294.  She also had headaches every day due to problems with her cervical spine. R. 294-95, 303.  The headaches were often the result of exposure to bright light or noise. R. 303.

Melendez experienced a lot of pain, including chest pain, and she had to use the bathroom frequently as a result of the side effects of her medication. R. 295.  She had difficulty concentrating, R. 296, and she was often fatigued, irritable, and depressed, R. 307-08.  She also had difficulty remembering things. R. 307.  It was difficult for her to obtain medical treatment due to limitations imposed by her insurer. R. 304.

Melendez could walk, but only for about five to ten minutes. R. 305.  She could stand, but not for long.  *Id*.  She had a cane that she occasionally used at home, but she did not bring it to the hearing. R. 304, 309.  She could not kneel, crouch, stoop, bend, or climb stairs. R. 305.  She had trouble grasping and holding items. R. 300, 306.  She could lift a gallon of milk with both hands but could not hold it for long. R. 306.  She sometimes wore a brace on her right hand that was given to her after surgery.  *Id*.

Melendez was only able to do some household chores.  R. 299.  She could fold clothing, make her bed, dust furniture, and wash a few dishes.  *Id*.  She could not place items in the washing machine, wash the bathrooms or windows, sweep, or mop.  *Id*.  Her daughter had to help her cook, and her daughter did most of the housework.  R. 299-300.  Melendez had a driver's license, but she did not drive.  R. 292.

Melendez had troubles bathing herself and needed her daughter to wash her hair.  R. 300.  She also had troubles dressing herself because she could not close buttons or operate zippers.  *Id*.  Putting on slacks caused pain in her hip.  R. 301.

On a typical day, Melendez woke up early with her husband, who would give her medication before he went to work.  *Id*.  She would take the medication, which made her drowsy, and then lie down in bed.  *Id*.  After getting out of bed, she would warm milk in the microwave, make coffee, and eat a light breakfast.  *Id*.  She would remain seated for a long time until her friend came over around 11:00 a.m.  *Id*.  Her friend would stay with Melendez until her daughter arrived.  *Id*.

Melendez had trouble sleeping because of back pain, cramps in her feet, and numbness in her arm.  R. 302.  Bursitis in her shoulders prevented her from sleeping on her side.  *Id*.  Her doctor had given her lorazepam[5] to assist her in sleeping.  *Id*.

---

[5] Lorazepam affects chemicals in the brain that may become unbalanced and cause anxiety and insomnia.  Drugs.com, *lorazepam*, http://www.drugs.com/mtm/lorazepam.html (last visited Mar. 13, 2007).

B.      *VE's Testimony*.

The VE testified that Melendez's past work as a machine operator required her to do a variety of tasks, which constituted light, medium, and heavy work.  R. 311.

The VE was asked to consider a hypothetical claimant of Melendez's age, education and past relevant work.  R. 312.  This claimant could lift twenty pounds occasionally and ten pounds frequently, sit, stand or walk for six hours in an eight hour day, could only occasionally climb, balance, stoop, kneel, crouch and crawl, and had to avoid concentrated exposure to extreme heat and hazards.  *Id*.  The VE responded that such an individual could not do Melendez's past work because it involved working around machinery.  *Id*.  However, the VE opined that there were a number of jobs that the hypothetical claimant could perform that existed in significant numbers in the national economy.  *Id.*

The VE was next asked to assume that the hypothetical claimant, along with her other limitations, "could only occasionally use either hand due to carpal tunnel syndrome[.]" R. 313. The VE responded that such an individual could be a surveillance system monitor, a food and beverage order clerk, or a ticket checker, all of which were in the sedentary category of work.  R. 313-14.  The VE further stated that the fact that such an individual could only perform simple, routine, repetitive tasks would not change her response.  R. 314.  Similarly, the hypothetical claimant could perform all of these jobs if she was limited to work at a sedentary level of exertion. *Id*.

The VE was then asked to assume that the hypothetical claimant could only stand, walk, and sit for two hours in an eight-hour day.  R. 314.  The VE responded that such an individual could not perform any work.  R. 314-15.

C.     *Medical Records.*

Melendez was treated by Evelyn Rivera-Ocasio, M.D., on several occasions, beginning on June 7, 2001.  R. 118.  At that time, she complained of upper and lower back pain radiating into her legs, as well as left shoulder pain.  *Id.*  Dr. Rivera-Ocasio noted that Melendez had previously undergone spinal surgery.  *Id.*  Upon examining Melendez, Dr. Rivera-Ocasio found her muscle strength to be a four on a scale of one to five.  R. 119.  She opined that Melendez should not engage in forceful activities.  *Id.*

Melendez returned to Dr. Rivera-Ocasio on September 10, 2001.  R. 117.  Dr. Rivera-Ocasio reviewed MRIs of the C-spine and the L-spine, both of which were negative.  *Id.*

On October 3, 2001, Melendez had an EMG taken of her upper extremities, which Dr. Rivera-Ocasio interpreted as displaying mild C6 radiculopathy.  R. 123.  A nerve conduction study of the upper extremities administered at the same time was normal.  R. 122.  On October 4, 2001, Melendez had an x-ray taken of her cervical spine, which revealed osteoarthrosis.[6]  R. 124.  On October 16, 2001, in reviewing the x-ray, Dr. Rivera-Ocasio suspected that Melendez had fibromyalgia.[7]  R. 116.

---

[6] Osteoarthritis is "[a]rthritis characterized by erosion of articular cartilage," causing pain and the loss of a joint's ability to function.  *Stedman's Medical Dictionary* 1267 (26th ed. 1995) (*Stedman's*).

[7] Fibromyalgia is characterized as long-term, body-wide pain in joints, muscles, tendons, and other soft tissues.  Medline Plus, *Fibromyalgia*, http://www.nlm.nih.gov/medlineplus/ency/article/

Melendez was hospitalized for three days in March 2002, apparently as a result of depression.  R. 249.  Thereafter, she was treated by Manuel A. Brignoni Román, a psychiatrist, through at least June 2002.  R. 237-49.  Dr. Román's DSM-IV diagnosis was major depressive disorder, recurrent, and he gave Melendez a global assessment of function (GAF) score of 58.[8]  R. 241.  On June 30, 2002, Dr. Román indicated that Melendez had been continuously disabled from June 20, 2002, and would not be able to return to work until January 20, 2003.  R. 249.

Melendez returned to Dr. Rivera-Ocasio in May 2002, complaining of pain radiating from her lower back into her right leg, and edema and swelling in her elbows and other locations.  R. 115.  On May 23, 2002, she had an EMG, which Dr. Rivera-Ocasio interpreted as displaying right S-1 radiculopathy.  R. 120.  She also had a nerve conduction velocity study, which was normal.  R. 121.

In October 2003, Melendez was examined by Miguel Burgos, M.D.  R. 128-30.  Melendez complained of insomnia, neck pain, and problems with her hand, arm, shoulder and upper back. R. 129.  Upon examination, Dr. Burgos confirmed the swelling in  Melendez's hand, and multiple joint pain.  R. 129-30.  His impression was osteoarthritis (OA) or rheumatoid arthritis (RA).  R. 130.

---

000427.htm (last visited Mar. 13, 2007).

[8]  The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition* 32 (4th ed. 1994) (hereinafter the "DSM-IV").  A score between 51 and 60 is defined as moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  *Id.*

On February 2, 2004, Melendez was examined by Nitin Haté, M.D., at the request of the

SSA.  She reported a history of knots in her cervical spine for the last ten years and pain in the

coccygeal[9] area.  R. 136.  She indicated that she had had a carpal tunnel release surgery performed

in 1996 and continued to have pain, swelling, and weakness in her hands.  R. 136.  She also

informed Dr. Haté that she had been diagnosed with arthritis.  *Id*.  Lastly, she indicated that she

had pain and swelling on her chest wall and was experiencing migraine headaches and depression.

*Id*.  Upon examining Melendez, Dr. Haté noted that the muscle strength was normal in all major

muscle groups and that Melendez's grip strength was normal.  R. 137.  However, Melendez

walked with a slight limp.  *Id*.  Dr. Haté noted that the only positive finding was that Melendez had

a restricted range of motion at the thoracolumbar region and shoulders.  R. 138.  He did not render

an opinion regarding Melendez's functional capacity except to write that any limitation she might

have would be secondary to pain.  *Id*.

Melendez was examined by William W. Austin, Psy.D., on February 3, 2004, at the request

of the SSA.  She reported that she continued to experience back pain with numbness in the lower

extremities after a L4-L5 herniation fifteen years earlier.  R. 142.  She also reported swelling of the

left shoulder with a diagnosis of bursitis, headaches, and lupus.  *Id*.

Melendez reported that she experienced crying spells, anhedonia, depressed mood, poor

appetite, irritability, insomnia, and suicidal ideation.  R. 142.  In reviewing medical records, Dr.

Austin noted that Melendez had been diagnosed with major depressive disorder.  *Id*.  Melendez

stated that she was hospitalized in 2002 as a result of an overdose.  *Id*.  She indicated that her basic

---

[9] The coccygeal area relates to "[t]he small bone at the end of the vertebral column[.]"
*Stedman's* at 359.

daily activities included caring for her personal hygiene, cooking, making the bed, folding laundry, and watching television. R. 143. She participated in church and Bible study. She also accompanied her spouse to the grocery store. *Id.*

Dr. Austin observed that Melendez's behavior was appropriate and that her thought process appeared linear. R. 143. Her attention and concentration were sustained throughout the evaluation. She demonstrated adequate short term and long term memory and her judgment, impulse control, and insight were adequate. *Id.* Dr. Austin's assessment was that Melendez had a major depressive disorder, recurrent. *Id.*

On May 25, 2004, Melendez was seen by Gopal Basisht, M.D. Melendez reported morning stiffness for an hour and a half, swelling and redness of her joints, dryness of the mouth, stinging of her skin, difficulty sleeping with pain lasting an average of three hours, intermittent diarrhea, and headaches all the time. R. 280. After an examination, Dr. Basisht noted that she had chest pain, a swollen upper chest, bursitis in the shoulders, back spasms, headaches all the time, a herniated disc at L4-L5, carpal tunnel, and bone spurs. R. 279.

On July 6, 2004, Melendez was examined by E. Lionel Nau, M.D. R. 167. She complained of headaches, body aches, and joint pain. *Id.* After a physical examination, Dr. Nau diagnosed her with migraines, arthritis, osteoporosis, depression, obesity, and cervical, lumbar, and shoulder pain. *Id.* His records consisted primarily of check marks on a form, without any explanation of the basis for the diagnoses. R. 167-71.

Melendez returned to Dr. Nau for a follow-up examination on July 22, 2004.  At that time, Dr. Nau's diagnosis was arthritis, osteoporosis, depression, obesity, hyperlipidemia, joint pain, and swelling.  R. 269.

Dr. Nau referred Melendez to Pamela G. Freeman, M.D., a rheumatologist, who examined Melendez on August 18, 2004.  R. 231.  Melendez's main complaint was general musculoskeletal discomfort, particularly in the knees and upper extremities.  *Id*.  During the physical examination, Dr. Freeman noted that Melendez's joints revealed more than three trigger points in the fibromyalgia distribution including the medial knee, trochanteric area, medial and lateral elbows, and the paracervical and paralumbar areas.  She observed that Melendez had good range of motion in the hips and knees, albeit with some pain.  She also observed that Melendez's grip strength was diminished in both hands.  R. 231.  Dr. Freeman's assessment was arthralgias,[10] myalgias,[11] and fatigue consistent with fibromyalgia.  R. 232.  Dr. Freeman did not render an opinion about Melendez's functional capacity.

Melendez was seen by Dr. Nau on November 23, 2004, complaining of elbow and leg pain. R. 266.  Once again, Dr. Nau's medical records do not contain a narrative description of the results of his examination.  *Id.*

Also on November 23, 2004, Dr. Nau completed a Physical Capability Form.  R. 264-65. Dr. Nau opined that during an eight-hour work day, Melendez could stand, walk, or sit for no more than two hours.  R. 264.  She could drive a car or truck for thirty to sixty minutes at intervals of

---

[10] Arthralgia is defined as "[s]evere pain in a joint, especially one not inflammatory in character." *Stedman's* at 149.

[11] Myalgia is defined as muscle pain.  *Stedman's* at 1161.

one to three hours. *Id*. She needed to take fifteen minute breaks every thirty minutes. *Id*. Dr. Nau

further opined that Melendez could lift less than ten pounds. *Id*. She could not use her hands for

repetitive grasping, pushing, or pulling, but could for fine manipulation. *Id*. She could not use her

feet for repetitive movement in operating foot controls. Melendez was occasionally able to bend

but could not squat, kneel, climb, or reach. R. 264. She could not work in humid conditions

because it increased the pain in her joints and bones. R. 265. Lastly, Dr. Nau noted that Melendez

was not required to use an assistive device for ambulation. *Id*.

      D.    *Reviewing Professionals*.

           1.    <u>Physical Functional Capacity Assessments</u>.

Violet A. Stone, M.D., prepared a physical RFC assessment after reviewing Melendez's

records in February 2004. Dr. Stone opined that Melendez could lift twenty pounds occasionally

and ten pounds frequently. R. 146. She could sit, stand, or walk about six hours during an eight-

hour workday, with no other functional limitations. R. 146-52.

In July 2004, Michael A. Pollack, M.D., completed a physical RFC assessment after

reviewing Melendez's medical records. R. 186-93. He opined that Melendez could lift up to

twenty pounds occasionally and ten pounds frequently. R. 187. She could sit, stand, or walk for

about six hours in an eight-hour workday. *Id*. She could only occasionally balance, stoop, kneel,

crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds, due to obesity and

degenerative joint and disc disease (DJD/DDD). R. 188. She should avoid concentrated

exposures to extreme heat and hazards. R. 190.

2.     Mental Functional Capacity Assessments.

Pamela D. Green, Ph.D., completed a Psychiatric Review Technique form after reviewing Melendez's records in February 2004.  R. 153-66.  Dr. Green opined that Melendez did not have any severe mental impairments.  R. 153.  She concluded that Melendez would have only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  R. 163.

In July 2004, Eric Wiener, Ph.D., a psychologist, completed a Psychiatric Review Technique form after reviewing Melendez's records.  Dr. Wiener concurred with Dr. Green's assessment.  R. 172-85.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In a case under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V. ANALYSIS.

Melendez asserts that the ALJ erred in not giving substantial weight to the testimony of her treating physicians and, as a result, erred in her RFC assessment. Melendez also asserts that the ALJ did not properly evaluate her complaints of the functional limitations arising from pain. These are the only issues I will address.[12]

### A. *Opinions of Treating Physicians.*

Melendez contends that the ALJ erred by failing to give controlling weight to Dr. Nau's assessment of her RFC. Dr. Nau was one of Melendez's treating physicians. The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id.* (internal citations omitted). The ALJ must articulate the reasons for giving lesser weight to the opinion of a treating physician. *Id.* However, the ultimate determination of whether a claimant qualifies for disability under the Act is made by the SSA. 20 C.F.R. § 404.1527(e)(1).

---

[12] The parties were advised that issues not specifically raised would be waived. Doc. No. 11 at 2.

In discrediting Dr. Nau's physical capacity assessment, the ALJ found that:

> Dr. Nau's opinion [was] not consistent with his own treatment records or those of other examining or treating physicians.  Dr. Nau started treating the claimant in July 2004 and listed most of her symptoms as normal.  He did indicate depression and anxiety, but provided no basis for the [listed] restrictions.

R. 21.  Prior to addressing Dr. Nau's imposed restrictions, the ALJ discussed the opinions of Melendez's other treating physicians. R. 19-21.

The ALJ's stated reasons for giving lesser weight to Dr. Nau's restrictions are supported by the record.  Dr. Nau's examination records were brief and provided no narrative statement of his findings supporting his conclusions.

Melendez argues that Dr. Freeman's records support the limitations that Dr. Nau listed on the Physical Capability Form.  However, while Dr. Freeman found that Melendez suffered from pain and fatigue, she also determined that Melendez had good range of motion in her hips and knees, with some loss of grip strength in her hands.   These findings do not support the extensive limitations on standing, walking, sitting, and use of the legs set forth in Dr. Nau's RFC assessment.

The ALJ applied the correct legal standard in assessing the weight to accord to Dr. Nau's opinion.  She articulated adequate reasons, supported by substantial evidence, for giving lesser weight to Dr. Nau's opinion, which is sufficient to establish good cause for her determination.  Accordingly, the assignment of error is unavailing.

B.      *The ALJ's Evaluation of Melendez's RFC.*

Melendez next contends that the ALJ's RFC assessment is inadequate because it failed to include a "function by function" assessment.  Melendez specifically contends that the ALJ failed

-18-

to consider her complaints of headaches and obesity, which were raised to a number of doctors. Doc. No. 14 at 7-8.

After evaluating the medical evidence, the ALJ articulated in her decision the proper standard for determining Melendez's RFC.  The ALJ reported that she had considered, among other things, Melendez's "daily activities; the location, duration, frequency, and intensity of the alleged pain or symptoms; precipitating or aggravating causes; the type, dosage, effectiveness, and side-effects of any medications; other measures and treatment for relief of the alleged pain or symptom; and other factors concerning functional limitations and restrictions due to the alleged pain or symptom."  R. 22.  After thoroughly setting out the standard for determining a claimant's RFC, the ALJ next considered Melendez's alleged symptoms and complaints.  The ALJ found that while Melendez retained "the residual functional capacity for light work with occasional postural limitations, she should avoid concentrated exposure to extreme heat and hazards, and is limited to occasional use of both hands due to carpal tunnel syndrome."  R. 23.

The ALJ's decision sufficiently analyzed Melendez's symptoms in determining her RFC. The ALJ analyzed all of the medical records, providing justification for giving lesser weight to Dr. Nau's opinions.  The ALJ also considered Melendez's allegations of impairments and pain. Therefore, the ALJ's analysis is sufficient to satisfy SSR 96-8p.  The ALJ's decision reflects a careful review of the evidence sufficient to enable the Court to understand the basis of her decision and the law applied.

Next, Melendez argues that the ALJ failed to consider her obesity and headaches in determining her RFC.  In evaluating the evidence, "there is no rigid requirement that the ALJ

specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not

a broad rejection which is 'not enough to enable [the district court or the appellate court] . . . to

conclude that [the ALJ] considered [the petitioner's] medical condition as a whole.'" *Dyer*, 395

F.3d at 1211 (quoting *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)).

The ALJ's decision reflects that she considered Melendez's complaints of headaches. R.

19-20, 22. She also incorporated limitations on postural activities in her RFC, which limitations

Dr. Pollack opined were necessary due to Melendez's obesity, among other things. R. 188. The

ALJ's decision reflects that she gave careful consideration to the record as a whole. She

articulated specific reasons for reaching her conclusion about Melendez's RFC, which are

supported by substantial evidence in the record. Accordingly, this assignment of error is

unavailing.

C.    *Melendez's Subjective Complaints of Pain*.

Melendez next argues that the ALJ failed properly to consider her subjective complaints

concerning her pain. In this circuit, a claimant's assertion of disability through testimony of pain or

other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard

requires (1) evidence of an underlying medical condition and either (2) objective medical evidence

that confirms the severity of the alleged pain arising from that condition or (3) that the objectively

determined medical condition is of such a severity that it can be reasonably expected to give rise to

the alleged pain." *Foote v. Chater*, 67 F.3d at 1560 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223

(11th Cir. 1991)). If the Commissioner discredits the claimant's subjective testimony, she "must

articulate explicit and adequate reasons for doing so." *Foote*, 67 F.3d at 1561-62.

-20-

In the present case, the ALJ acknowledged the pain standard applicable in this circuit, R. 22, and applied it appropriately.  She found that Melendez had underlying impairments that could cause the pain about which she complained, but she concluded that Melendez's "subjective complaints [were] not credible or consistent with treating source evidence to the degree alleged and fail[ed] to show that the objectively determined medical conditions are of such severity that they can be reasonably expected to give rise to the alleged pain or symptom to a disabling degree." R. 22.  While the ALJ could have been clearer in articulating the reasons that she relied upon to discredit Melendez's testimony, the evidence supports her conclusion for the reasons discussed above regarding the ALJ's RFC assessment, and her rejection of Dr. Nau's RFC assessment. Consequently, this assignment of error is also unavailing.

**V.      CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 13th, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-21-